IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| NICHOLAS G. CASTEEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   Case No. 4:12-CV-445-SPM |
| | ) |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Michael J. Astrue, the Commissioner of Social Security, denying the application of

Plaintiff Nicholas G. Casteel for Supplemental Security Income (SSI) under Title XVI of the

Social Security Act, 42 U.S.C. §§ 405(g) *et seq.* (the "Act").  The parties have consented to the

jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. §

636(c)(1).  For reasons stated below, the Court reverses the Commissioner's denial of Plaintiff's

application and remands for further proceedings.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant in this case.

# I.        FACTUAL BACKGROUND

## A.  BACKGROUND

At the time of his hearing in this case, Plaintiff Nicholas Casteel was 24 years old.  (Tr. 45).  He possesses a driver's license and is able to drive.  Plaintiff left school after tenth grade and does not have a GED.  (Tr. 46).

Plaintiff's most recent work was as an assistant mechanic in 2009.  He left the job after a month because he could not handle the physical work, which involved bending; because he "would shake really bad"; and because he "didn't do good around everybody."   (Tr. 47).  Plaintiff worked for Wright Tree Service as a groundsman; he left after a month and a half because it was too physically hard and because he found it hard to be around people.  Before that, Plaintiff worked as a roofer in his uncle's company; he left after a couple of weeks because he "just couldn't handle the lifting and going up the ladders and hammering and everything." (Tr. 48).  Before that, Plaintiff worked briefly at a fireworks retailer, which he left because he could not do the lifting the job required, and at a novelty shop in 2008, which he left because he "just couldn't be around people."   (Tr. 48-49).  Plaintiff stated that his arms and legs shake regularly and this has affected his performance at every job.  (Tr. 59).

Plaintiff testified that his dystonia causes him pain "everywhere," including in his arms, legs, and face, and that it occurs every day and can last anywhere from a few minutes to several hours.  (Tr. 50).  Plaintiff testified that he can walk a short distance but that he has difficulty walking up stairs because his legs are weak and because he has nerve damage.  He also stated that he has trouble sitting for long periods of time because he gets pain in his neck; he estimates that he can sit for thirty to forty-five minutes.  Plaintiff has difficulty reading because "my words move on me", which he attributes to dystonia.  (Tr. 52).  He also testified that he has experienced

auditory and visual hallucinations on a weekly basis for at least the past year.  (Tr. 53-54).

Plaintiff stated that he has short-term memory loss that inhibits him from finishing projects he

starts.  He also stated that he has trouble concentrating since he gets dizzy.  (Tr. 54).  Plaintiff

testified that he becomes nervous around people and this causes him to perspire profusely.

However, Plaintiff lives with his wife and daughter and stated that he does not have difficulty

being around them.  Plaintiff stated that he has some friends and that he has one friend who

comes over to his house.  He further stated that it does not bother him to be around his close

friends. (Tr. 55).

Plaintiff stated that he experiences anxiety attacks two to three times a week lasting thirty

to forty-five minutes; his symptoms include heart palpitations, dizziness, and the feeling of being

overwhelmed by his surroundings.  (Tr. 60).

He stated that he regularly has difficulty sleeping because he hears voices at night.  (Tr.

56).  At night, Plaintiff checks the door three or four times to ensure that it is locked, and he

checks to make sure no dishes have been left in the sink and that there is no more than one bag of

trash in the house.  (Tr. 59).

Plaintiff has been seeing Dr. Haas and Dr. Gavirneni, and up until recently he was also

seeing Dr. Malik.  (Tr. 50-51).  He takes Celexa,[2] trazodone,[3] trihexyphenidyl,[4] and Geodon.[5]

---

[2] Celexa is a brand name for citalopram; it is used to treat depression and sometimes to treat eating disorders, alcoholism, panic disorder and social phobia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html

[3] Trazodone is used to treat depression and sometimes to treat insomnia, schizophrenia, and anxiety.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html

[4] Trihexyphenidyl is used to treat Parkinson's disease and tremors caused by other medical problems or drugs.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682160.html

[5] Geodon is a brand name for ziprasidone; it is used to treat schizophrenia and episodes of mania or mixed episodes for patients with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699062.html

(Tr. 51).  Plaintiff stated that the medications do not completely help him, and that one side effect of Geodon is that it makes him drowsy.  (Tr. 51, 58).  He stated that his doctors recommended physical therapy but he did not participate in it because "they said it wasn't going to help me . . . there's no cure for what I have."  (Tr. 51-52).

Plaintiff stated that on a typical day, he attempts to clean the house; he sweeps and scrubs the floor, cleans the dishes, and takes out the trash.  (Tr. 55-56).  Plaintiff estimated that he is unable to clean approximately two to three times per week due to fatigue.  (Tr. 57-58).  He also takes care of his one-year-old daughter by cleaning her clothes, changing and bathing her, playing with her on the floor, and singing to her.  (Tr. 55-56).

Plaintiff's mother, Dana Veesman, also testified at Plaintiff's hearing.  (Tr. 61-70).  Ms. Veesman testified that she sees the Plaintiff approximately three to four times a week at his house.  (Tr. 62).  She stated that she knows when the Plaintiff is having paranoid thoughts, because he does not want to leave the house and he verbalizes his belief that the neighbors are talking about him.  She also stated that she can tell that he is experiencing an auditory hallucination by the way he speaks.  (Tr. 64).  Ms. Veesman also testified that she enrolled Plaintiff in Harmony House, a psychosocial rehabilitation facility, following his stay at Center Pointe Hospital.  (Tr. 62-63).

Ms. Veesman testified that when Plaintiff was a child, she believes that he was mentally and verbally abused.  (Tr. 66-68).  She testified that Plaintiff made a suicide attempt in eighth grade, partly out of fear of being around other students in high school.  She stated that she enrolled Plaintiff in counseling in middle school; he would call his mother and ask her to retrieve him from school because he believed other students were staring at him.  (Tr. 66).

**B.  RECORDS OF TREATING AND EXAMINING SOURCES**

*1.  RECORDS OF DR. JOSEPH EICKMEYER, D.O. (OCTOBER 1998 – NOVEMBER 2007)*

In October 2006, Plaintiff saw Dr. Joseph Eickmeyer and reported that he "has had progressive dizziness and weakness for the past 2 years.  He said it makes him unable to follow the lines when he reads, cause him dizzy spells, he drops things when he is eating – such as a fork, sometimes he walks wobbly as if he is drunk."  Dr. Eickmeyer noted that Plaintiff had quite a bit of difficulty doing a Romberg's test and could not do finger to nose testing more than two or three times because it was making him feel dizzy.  Dr. Eickmeyer's impression was that Plaintiff might have a movement disorder or a cerebellar lesion.  Dr. Eickmeyer ordered an MRI and referred Plaintiff to Dr. Joel Perlmutter at the Movement Disorder Clinic at Barnes Hospital. (Tr. 283).

On November 3, 2006, Plaintiff returned to Dr. Eickmeyer, complaining of shakiness, forgetfulness, unsteady gait, and depression.  Plaintiff reported that he was unable to work due to muscle weakness and an inability to drive at dusk.  Dr. Eickmeyer noted that a brain MRI had come back normal.  Again, Plaintiff had difficulty doing a Romberg's test or touching his finger to his nose.  Dr. Eickmeyer's impression was that he might have a movement disorder such as Parkinson's.  (Tr. 282).

In June 2007, Plaintiff returned to Dr. Eickmeyer, reporting that other consulting physicians had told him that he had an anxiety disorder and should follow up with his primary care doctor.  Dr. Eickmeyer diagnosed anxiety disorder and central auditory processing disorder and started Plaintiff on Lexapro.  (Tr. 281).

### 2.   CONSULTATIVE EXAMINATION BY GIHAN KADER, M.D. (FEBRUARY 14, 2007)

On February 14, 2007, Gihan Kader, a neurologist, conducted a neurological evaluation of Plaintiff.  (Tr. 317-19).  Dr. Kader found that Plaintiff's neurological examination was normal, and he found that there was "no evidence of neurologic disease or Parkinson's Disease," but that he suspected personality disorder.  (Tr. 319).

### 3.   RECORDS OF DR. JOEL PERLMUTTER, M.D. (APRIL-JUNE 2007)

In April 2007, Plaintiff was seen at the Movement Disorder Center by Dr. Joel Perlmutter and Dr. Moravid Karimi, M.D., complaining of shaking in his arms, legs, and head and some tingling in his left knee.  (Tr. 272).  On June 13, 2007, Dr. Perlmutter wrote a report in which he assessed memory problems, tremor, and depressive symptoms.  Dr. Perlmutter assessed that Plaintiff has "a normal neurological examination.  He does not have any signs of Parkinson disease or any other neurodegenerative disorder."  Dr. Perlmutter found signs of moderate depression and believed that the tremor and memory problems could both stem from depression, and "emphasized that [Plaintiff] should not seek disability and avoid enabling behavior of relatives and friends."  Dr. Perlmutter referred to Dr. Fucetola for a neuropsychological evaluation and to Dr. de Erausquin for treatment of depression.  (Tr. 274).

### 4.   CONSULTATIVE EXAMINATION BY ROBERT FUCETOLA, PH.D. (JUNE 2007)

On June 4, 2007, Robert Fucetola, Ph.D., a clinical neuropsychologist, conducted a neuropsychological assessment of Plaintiff.  (Tr. 275-79).  Plaintiff reported that he "twitches" frequently and "forgets things" more than he used to, and that he "often forgets his intent when entering a room."  He reported that his mood was "pretty good" but that he was "sick" with worry and second-guesses himself a lot.  He also reported very low energy.  (Tr. 275).  His eye contact was poor, and his processing speed and execution of tasks was slow.  (Tr. 276).

Dr. Fucetola conducted several tests and found that Plaintiff's IQ score was low average; that his academic abilities were within expectation for age, grade level, and IQ; that his problem solving and reasoning abilities were generally within normal limits; that his attention was generally within normal limits, with some minor variability; and that his constructional skills were within normal limits. (Tr. 277-78). However, Plaintiff "performed very poorly on measures of learning and memory," and his personality testing "was indicative of a very high-level of anxiety and somatic concern." Regarding Plaintiff's physical symptoms, Dr. Fucetola stated, "I think it is very possible that the usual physical symptoms Mr. Casteel has noticed (including bilateral leg numbness below the knee) may be psychogenic." Dr. Fucetola recommended individual psychotherapy aimed at reducing his anxiety, self doubts, and excessive worry. (Tr. 278).

### 5. CENTER POINTE HOSPITAL RECORDS (AUGUST 2008)

On August 4, 2008, Plaintiff was hospitalized at Center Pointe Hospital for five days as a result of voicing suicidal thoughts, having "anger outbursts," reporting hearing voices, and abusing alcohol and drugs. (Tr. 363). His Global Assessment of Functioning ("GAF") score at admission was 20.[6] (Tr. 364). It was noted that he had "flight of ideas and was jumping from one topic to another," and that he "seemed to be paranoid on interview" and had "a lot of somatic complaints." (Tr. 371). During his hospitalization, he received medication adjustments and therapy, and he reported improvement in symptoms soon after admission. It was noted that

---

[6] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF of 11-20 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g.., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." *Id.*

7

Plaintiff appeared grandiose at times, complained of short-term memory problems, and appeared to have poor insight.  Plaintiff noted seeing "spots in the corner of [his] eye."  (Tr. 368).  Plaintiff was prescribed lithium,[7] Remeron,[8] and Zyprexa,[9] and ordered to begin an alcohol detoxification protocol.  (Tr. 363).  At discharge on August 9, 2008, Plaintiff was diagnosed with bipolar affective disorder, polysubstance dependence, Parkinson's disease, and valvular heart disease.

On August 13, 2008, Plaintiff went to the Acute Outpatient Program at Center Pointe Hospital for management of his bipolar symptoms.  Plaintiff stated, "I honestly don't need this program.  I need a neurologist."  He reported symptoms of anxiety and depression, but he denied past or current psychotic symptoms or substance abuse.  He attended only one session of the program, during which he was quiet and guarded, had a flat affect, and had poor eye contact. (Tr. 399).  He stopped the group therapy program, stating on August 18, 2008, "I'm done with group.  I feel better."  It was noted that he had limited insight into his illness.  At discharge, Kelly Hoene, L.C.S.W., diagnosed Plaintiff with psychotic disorder not otherwise specified, polysubstance abuse, physical pain and leg weakness, chronic mental illness, and poor coping skills, and she assigned him a GAF of 40.  (Tr. 400).

### 6.  RECORDS OF DR. MAHEEN MALIK, M.D. (AUGUST 2008 – FEBRUARY 2009)

On August 25, 2008, Dr. Malik noted that Plaintiff had dropped out of school in ninth grade because he could not keep up with the writing, and that he was home schooled.  He noted that Plaintiff tried various jobs but that his hand would shake and he would drop things.

---

[7] Lithium is used to treat episodes of mania in patients with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html

[8] Remeron is a brand name for mirtazapine; it is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697009.html

[9] Zyprexa is a brand name for olanzapine; it is used to treat schizophrenia and bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html

Plaintiff's examination showed mild dystonic posture as he wrote, but his gait was steady.  Dr. Malik's impression was dystonia, multifocal, and he started Plaintiff on Artane. [10]  (Tr. 523).

On September 3, 2008, an MRI of Plaintiff's brain ordered by Dr. Malik was negative. (Tr. 498).  On September 25, 2008, Plaintiff reported tightening in his arms.  These notes are largely illegible.  (Tr. 522).

On February 13, 2009, Dr. Malik noted an Artane prescription for Plaintiff.  (Tr. 522).

### 7.  RECORDS OF ST. JOHN'S MERCY HOSPITAL (APRIL – JUNE 2009)

From April 12 through April 14, 2009, Plaintiff was admitted to the hospital for an infected wound in his leg.  (Tr. 525-28).  Records indicate no complaints related to movement or a psychiatric condition.

On June 30, 2009, Plaintiff was seen for a spider bite and reported fever, dizziness, and nausea.  (Tr. 529).

### 8.  CONSULTATIVE EXAMINATION BY JOSEPH M. LONG, PH.D. (FEBRUARY 18, 2010)

On February 18, 2010, Joseph M. Long, Ph.D., a clinical psychologist, conducted a psychological evaluation of Plaintiff.   (Tr. 538-40).   He interviewed Plaintiff, reviewed Plaintiff's treatment records from his April 2009 hospital visit related to a leg wound, and reviewed background information provided by the disability office.  However, he performed no formal psychological testing.   Dr. Long found Plaintiff's affect to be "essentially flat and constrained with a moderately anxious quality."  (Tr. 538).  Plaintiff spoke in a "slow, halting monotone voice" and "made little eye contact with the examiner."  (Tr. 539).  Dr. Long found Plaintiff's thought process to be "basically logical and coherent" although Plaintiff was "vague"

---

[10] Artane is a brand name for trihexyphenidyl; it is used to treat Parkinson's disease and tremors caused by other medical problems or drugs.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682160.html

regarding the details of his mental health history.  (Tr. 538).  Dr. Long estimated that Plaintiff's intellect was in the average to low average range.  (Tr. 539).  Dr. Long found no evidence of gross impairment of psychological functioning due to hallucinations, delusional ideation, or extreme emotional lability.  (Tr. 538).

Dr. Long's impressions were that Plaintiff suffered from bipolar disorder, probable anxiety disorder, alcohol abuse in reported remission, and marijuana abuse.  Dr. Long found that Plaintiff's ability to understand and remember instructions was mildly impaired; that Plaintiff's ability to sustain concentration and persist with tasks was moderately impaired; and that his social and adaptive functioning was moderately impaired.  Dr. Long further found that Plaintiff was able to manage basic finances.  (Tr. 540).

### 9.  RECORDS OF DR. JAMIE HAAS – PATIENTS FIRST HEALTH CARE (FEBRUARY 2010 – JUNE 2010)

On February 2, 2010, Plaintiff saw Dr. Jamie Haas, complaining of dystonia.  Plaintiff stated that he gets weak, has trouble with his hands shaking, and has pain in his legs, and that his hand and shoulder can stiffen on him.  He also reported that he becomes nervous, and has difficulty concentrating and focusing, and can get nervous and paranoid.  He reported that he had been prescribed Artane and that it gave him some relief from dystonia, but that it "wears off" and that he had not had it since August 2009.  (Tr. 564).  Dr. Haas noted that there was a "tremor with FNF [finger-nose-finger test], no resting tremor, no dystonic movements noted."  Dr. Haas assessed that Plaintiff had "an action tremor on exam today but nothing else overwhelming.  He reportedly has done better on Artane but does not believe that this was strong or frequent enough."  Dr. Haas increased Plaintiff's Artane dosage and noted that he needed to see a psychiatrist about his other issues.  (Tr. 565).

On June 3, 2010, Plaintiff returned to Dr. Haas and reported that the Artane had helped some but that he still had persistent symptoms.  He also reported that he could not take the Artane more than twice daily without side effects.  (Tr. 561).  He reported being unable to do continuous standing or motor activity without muscle stiffness, jerking, or shaking, and that he had been unable to keep a manual labor job.  (Tr. 561).  Dr. Haas's review of symptoms was negative for gait disturbance and psychiatric symptoms.  He noted a tremor on the finger-nose-finger test.  (Tr. 562).  Dr. Haas continued Plaintiff's Artane (Trihexyphenidyl) prescription.  (Tr. 563).

On June 3, 2010, Dr. Haas completed a Medical Source Statement for Plaintiff.  (Tr. 566-67).  Dr. Haas found that Plaintiff could lift 6 to 10 pounds frequently and 11 to 25 pounds occasionally; could stand and/or walk for 20 minutes continuously and for a total of 2 hours during an 8-hour workday; could sit continuously for 6 to 8 hours for a total of 8 hours per 8-hour workday; and could push and/or pull continuously for 20 to 30 minutes continuously for a total of 2 hours during an 8-hour workday.  (Tr. 566).  He also found that Plaintiff could bend, kneel, reach, handle and finger occasionally, and that he could work in jobs involving heights, machinery, temperature extremes, fumes, and vibration frequently.  (Tr. 567).

### 10. RECORDS OF DR. SRI GAVIRNENI, M.D. AND OTHERS AT CRIDER HEALTH CENTER (2010-2011)

Between April 23, 2010 and April 1, 2011, Plaintiff was seen by psychiatrist Dr. Sri Gavirneni on 13 occasions.  (Tr. 569-72, 589-91, 593, 635, 637, 639, 641, 676, 678, 680).  At most of these visits, Dr. Gavirneni diagnosed Plaintiff with Major Depressive Disorder, Generalized Anxiety Disorder, and mood stresses or Mood Disorder NOS.  (Tr. 569-70, 573, 590, 592, 638, 640, 636, 677, 679, 681).  In addition, at most of those visits, Dr. Gavirneni observed that Plaintiff was alert and oriented, had good or fair eye contact, was cooperative, had

psychomotor activity within normal limits, had appropriate behavior, had spontaneous and coherent speech, had a logical thought process, had no suicidal or homicidal ideations, and had good judgment and insight.  (Tr. 589, 591, 635, 637, 639, 641, 676, 678, 680).  However, Dr. Gavirneni often noted that Plaintiff's mood and affect were blunted or anxious, that Plaintiff had paranoid ideas, and that Plaintiff had auditory hallucinations.  (Tr. 589, 591, 637, 639, 641, 678, 680).  These records are discussed in more detail below.

On April 23, 2010, Plaintiff went to Dr. Gavirneni with the chief complaint of anxiety. He reported that he gets nervous around people, cannot go to stores, and has been isolating himself.  He stated that his eyes and arms are "jerky" and that he has nerve damage from the knee down.  He reported being paranoid, panicky, and nervous, and that he gets overwhelmed and wants things perfect.  He also reported being sad, having no energy, and having no motivation.  Plaintiff stated that he drank alcohol heavily from ages 19 to 21 and that he has been sober for 3 years.  Plaintiff further stated that he smoked marijuana from ages 16 to 22 and then quit.  (Tr. 571).  Dr. Gavirneni noted that Plaintiff had head tremors, that his mood was not good, and that his affect was anxious.  He diagnosed Major Depressive Disorder and Generalized Anxiety Disorder and started Plaintiff on Celexa.[11]  Dr. Gavirneni assessed a GAF of 55.[12]  (Tr. 572).

---

[11] The Court notes that Dr. Gavirneni's handwriting is not very clear with respect to this drug, but given Plaintiff's testimony that he is on Celexa, the Court interprets this and similar notes from Dr. Gavirneni to be "Celexa."

[12] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *DSM-IV* 32.

12

On April 26, 2010, Nicole Skylis, L.C.S.W., diagnosed Plaintiff with Major Depressive Disorder, Generalized Anxiety Disorder, and Idiopathic Torsion Dystonia and assessed a GAF score of 55.  (Tr. 573).

On May 14, 2010, Plaintiff returned to Dr. Gavirneni, and notes state that he was "doing much better on Celexa," that he was tolerating it well, and that he felt "more relaxed and mellowed."  However, he still had anxiety attacks.  His mood was "ok," and his affect was "anxious."  Dr. Gavirneni increased his Celexa dosage.  (Tr. 570).

On June 11, 2010, Dr. Gavirneni reported that Plaintiff "feels much better on Celexa" but that he "still has [a] lot of anxiety and worries a lot."  It was noted that he was tolerating his medication well.  His mood was "ok," and his affect was anxious.  Dr. Gavirneni again increased his Celexa dosage.  (Tr. 569).

On July 9, 2010, Dr. Gavirneni reported that Plaintiff "feels much better on a [higher] dose of Celexa but still paranoid and hears some voices but no command hallucinations."  On mental status examination, his mood was ok, and his affect was anxious.  Dr. Gavirneni continued Plaintiff's Celexa prescription and started Abilify.[13]  (Tr. 593).

On July 16, 2010, Dr. Gavirneni reported that Plaintiff was nervous, pacing and lightheaded on Abilify.  In addition, Plaintiff was "still paranoid and hears some voices."  (Tr. 589).  Plaintiff had a blunted affect.  (Tr. 589).  Dr. Gavirneni discontinued Abilify and started Plaintiff on Fanapt.[14]  (Tr. 590).

---

[13] Abilify is the brand name for aripiprazole; it is used to treat symptoms of schizophrenia, episodes of mania or mixed episodes, or used with an antidepressant to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html

[14] Fanapt is a brand name for iloperidone; it is used to treat the symptoms of schizophrenia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a609026.html

On July 30, 2010, Dr. Gavirneni reported that Plaintiff was "not hearing voices as much but still paranoid – people coming into the house" and that "anxiety is same." On mental status examination, his mood and affect were anxious, he had paranoid ideas, and he had auditory hallucinations. (Tr. 591). Dr. Gavirneni increased Plaintiff's Fanapt dosage. (Tr. 592).

On August 20, 2010, Dr. Gavirneni reported that Plaintiff was "having side effects from [higher] doses of Fanapt" and that he stopped taking it. Plaintiff was still having anxiety attacks and was still paranoid and hearing voices. On mental status examination, his affect was irritable, his mood was anxious, he had paranoid ideas, and he was responding to internal stimuli. (Tr. 641). Dr. Gavirneni increased Plaintiff's Celexa dosage and started him on Geodon. (Tr. 642).

On October 8, 2010, Dr. Gavirneni reported that Plaintiff had no psychosis and that his anxiety was still there but was much better. He noted that Plaintiff was tolerating his medications well. On mental status examination, Plaintiff's mood was "ok," and he was not responding to internal stimuli. However, his affect was anxious. (Tr. 637).

On November 10, 2010, Dr. Gavirneni reported that Plaintiff was "not hearing voices" and had "no paranoia." However, he was anxious around people. It was noted that he was better since increasing his Celexa, but that he felt too tired on Geodon. On mental status examination, Plaintiff's mood was "ok," and he was not responding to internal stimuli. However, his affect was anxious. (Tr. 639). Dr. Gavirneni decreased his Geodon prescription. (Tr. 640).

On December 10, 2010, Dr. Gavirneni reported that Plaintiff was "not taking Geodon" and "not sleeping." Celexa was "helping," and Plaintiff's mood was "stable." It was noted that Plaintiff "hears voices but are at baseline." On mental status examination, Plaintiff's mood was "ok." However, he had an anxious affect, and he was responding to internal stimuli "at baseline." (Tr. 635). Dr. Gavirneni discontinued Geodon and started trazodone. (Tr. 636).

On February 4, 2011,[15] Dr. Gavirneni reported that Plaintiff "hears voices through vent talking about him" and noted that he "spoke out loud as if he had conversations." Plaintiff reported being more paranoid recently. He reported that he was sleeping better on trazodone and that Geodon did not help. On mental status examination, Plaintiff's mood was "ok," but his affect was anxious, and he had auditory hallucinations. (Tr. 680). Dr. Gavirneni continued Celexa and trazodone and started Plaintiff on Risperdal.[16] (Tr. 681).

On March 4, 2011, Dr. Gavirneni noted that Plaintiff "feels loopy on Risperdal" and stopped his trazodone. Plaintiff reported hearing voices through the vent telling him bad things, but that he ignored them. He reported no command hallucinations and indicated that his anxiety was better. On mental status examination, Plaintiff had good eye contact, appropriate and cooperative behavior, spontaneous and coherent speech, logical thought processes, and good judgment and insight. His mood was "ok." However, his affect was anxious and he had auditory hallucinations. (Tr. 678). Dr. Gavirneni discontinued Risperdal, continued trazodone and Celexa, and started Seroquel. (Tr. 679).

On April 1, 2011, Dr. Gavirneni reported that Plaintiff was "doing much better on Seroquel, not hearing voices." He stated that Plaintiff's mood was stable, his anxiety was better, he was sleeping better, and he was tolerating his medication well. On mental status examination, Plaintiff had good eye contact, was cooperative, had spontaneous and coherent speech, had a "good" mood, had a "euthymic" affect, had a logical thought process, denied suicidal or

---

[15] The records from Crider Health Center dated on or after February 4, 2011 were not before the ALJ at Plaintiff's hearing but were submitted to Appeals Council on review. (Tr. 670- 81).

[16] Risperdal is a brand name for risperidone, which is used to treat the symptoms of schizophrenia; it is also used to treat bipolar disorder and behavior problems. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html

homicidal ideations, was not responding to internal stimuli, and had good insight and judgment. (Tr. 676).  Dr. Gavirneni continued his medications.  (Tr. 677).

On April 15, 2011, Plaintiff was seen at Crider Health Center by Jorie Spesard, P.L.C.S.W.  (Tr. 674-75).  Plaintiff reported that he was in need of services for help with alcohol abuse, issues of grief/loss, self-esteem, and mood management.  Ms. Spesard stated that he did not appear to be taking his medication as prescribed and that he reported increased alcohol use due to current stressors.  She observed that Plaintiff appeared lethargic and made minimal eye contact.  Plaintiff began the session by reporting a "black figure" he saw at age 7 and alluded to the fact that the believed he was abducted by aliens.  He brought up similar occurrences throughout the session, and Ms. Spesard noted that she was unable to identify what were actual occurrences in Plaintiff's life versus what were possible hallucinations and delusions.  Plaintiff admitted to drinking 17 or more beers each night.  Ms. Spesard reported that Plaintiff "appeared lethargic and made minimal eye contact throughout the session."  (Tr. 674).

### 11. CONSULTATIVE EXAMINATION OF ANA MARIA SOTO, M.D. (OCTOBER 1, 2010)

On October 1, 2010, Dr. Soto, a psychiatrist, evaluated Plaintiff for the purpose of his disability application.  (Tr. 594-601).  Dr. Soto based her evaluation on a five-hour consultation with Plaintiff and his mother, whom she found to be "highly reliable without exaggeration of symptoms," as well as her review of Plaintiff's medical records.  (Tr. 594).  Dr. Soto described in detail Plaintiff's medical and social history, including a difficult birth in which he remained in the delivery canal for three hours, a learning disorder diagnosis at age 8 or 9, counseling at age 14 related to abuse at home, drug use from age 15 to 17, a history of obsessive compulsive symptoms, a history of overt anxiety during childhood, evidence of a panic disorder at age 14, his hospitalization in August 2008, and his outpatient visits since then.  (Tr. 660-64).  Dr. Soto

found that Plaintiff's symptoms "have been developing over time, culminating in full-blown schizophrenia with an affective component, primarily depressed." She opined that Plaintiff had a prodromal phase of years that manifested primarily through irritability, somatic concerns, severe anxiety, and mood dysregulation, and eventually developing into psychotic symptoms. (Tr. 661). She noted that he experiences symptoms of schizophrenia, including isolation, withdrawn behavior, déjà vu, auditory hallucinations, visual hallucinations, lapses of memory, and persecutory ideations. (Tr. 661-62). She noted that Plaintiff sometimes questions the reality of his experiences but at other times believes that they are real. (Tr. 662).

Dr. Soto found Plaintiff was moderately impaired in activities of daily living, noting that his shopping was usually done by someone else, that he had difficulties paying bills, that he had difficulty with stairs, that he had difficulty standing, that he could only walk a block or so, and that he has difficulty reading because his eyes jump up and down. (Tr. 663).

Dr. Soto found that Plaintiff was severely impaired in social functioning, finding that he has panic attacks, agoraphobia, and psychotic symptoms, including the belief that everyone is talking about him and an obscure but pervasive sense of danger and persecutory ideation. (Tr. 663).

Dr. Soto found that Plaintiff's ability to complete tasks was severely impaired, primarily due to difficulties in concentration and maintaining a task; she noted that voices interfere with what he is trying to accomplish. (Tr. 664).

On mental status examination, Dr. Soto found that Plaintiff walked with a limp; was overall cooperative but with signs of distraction; showed slow movement and production of speech; had soft, slow, hesitant, monotonous speech; had a mood that was despairing, anxious, depressed, and futile; had an affect that was constricted and almost flat; had a sense of déjà vu;

had auditory hallucinations with voices talking to each other; had visual hallucinations; had a thought flow that was at time fragmented; had thought content that revealed a persecutory trend; and had severe problems in concentration. (Tr. 665).

Dr. Soto diagnosed Plaintiff with schizoaffective disorder, depressive type; obsessive compulsive disorder; panic disorder associated with agoraphobia; borderline intellectual function; back pain, history of weakness; dystonic reaction; and possible Parkinson symptomatology. (Tr. 666). She assessed a GAF score in the 35 to 40 range.[17] (Tr. 601).

### 12. PSYCHIATRIC EVALUATION NOTE TO APPEALS COURT DECISION, ANA MARIA SOTO, M.D. (APRIL 8, 2011)

On April 8, 2011, Dr. Soto wrote to the Disability Service Council. (Tr. 671-73). In the letter, she responded to some of the ALJ's concerns about her report, including a statement that she had not simply accepted Plaintiff's statements without question and that her opinions were supported by the medical record and by her own observations of Plaintiff's symptoms. (Tr. 672).

### C. OPINION EVIDENCE FROM NON-EXAMINING SOURCES

### 1. PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RFC ASSESSMENT OF STANLEY HUTSON, PH.D. (JANUARY 12, 2009)

On January 12, 2009, Stanley Hutson, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Capacity Assessment for Plaintiff. (Tr. 502-13, 514-16). He found that Plaintiff had moderate restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 510). Dr. Hutson found moderate limitations in

---

[17] A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoid friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* 32.

Plaintiff's abilities to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others.  (Tr. 514-15).  He found no significant limitations in the other areas of functioning he assessed.  (Tr. 514-16).

### 2. PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RFC ASSESSMENT OF AINE KRESHECK (MARCH 2, 2010)

On March 2, 2010, Aine Kresheck[18] completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment for Plaintiff.  (Tr. 541-55).  Ms. Kresheck found mild restriction of activities of daily living; moderate restriction in maintaining social functioning; and moderate restriction in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration.  (Tr. 552).

Ms. Kresheck found moderate limitations in Plaintiff's abilities to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting.  (Tr. 541-42).  She found no significant limitations in the other areas she assessed.  Ms. Kresheck opined that Plaintiff "must avoid work involving intense or

---

[18]The record does not indicate Ms. Kreschek's qualifications, and there is no indication that she examined Plaintiff.

extensive interpersonal interaction, handling complaints or dissatisfied customers, close proximity to coworkers, close proximity to available controlled substances, multi-step instructions, multi-tasking activities, and public contact." (Tr. 543).

### D. VOCATIONAL EVIDENCE

Vocational Expert Gary Weimholt, a private vocational rehabilitation consultant, testified at the hearing before the ALJ. (Tr. 70-78). The VE testified that Plaintiff's past work as a stock clerk was semi-skilled and heavy; his past work as a helper in a tree trimming service was unskilled and heavy, and his past work as an auto mechanic helper was semi-skilled and heavy. (Tr. 72-73). The ALJ first posed the following hypothetical to the VE:

> [P]lease assume a person capable of frequently lifting up to 10     pounds, occasionally lifting up to 25 pounds, standing or walking up to two hours out of an eight-hour workday but only 20 minutes continuously, and sitting up to eight hours out of an eight-hour workday but only six hours continuously, pushing or pulling up to two hours out of . . . an eight-hour workday but only 30 minutes continuously. Please also assume that the person is limited to performing simple, repetitive tasks with only occasional interaction with coworkers and supervisors and the public and no transactional interaction with the public. Would such a person be able to perform any of the claimant's past work?

(Tr. 73). The VE testified that he did not believe such an individual would be able to return to Plaintiff's past work, but that he could perform light assembly work (2,500 jobs in the state and 125,000 jobs nationally) or hand packaging work (2,500 jobs in the state and 125,000 jobs nationally). (Tr. 73-74). The ALJ then described a second hypothetical individual:

> Please assume that the person is capable of performing the full range of sedentary work. However, that person is limited to the simple, repetitive tasks and then occasional interaction with coworkers and supervisors and no interaction with the public. Would that person be able to perform any of the claimant's past work?

(Tr. 74). The VE testified that he did not believe such an individual could return to Plaintiff's past work, but that other jobs would exist in the national economy, including packaging pharmaceutical goods (1,200 in the state and 60,000 nationally), simple assembly of small plastic

goods, small medical goods, or decorator-type objects (4,500 in the state and 225,000 nationally).  (Tr. 74-75).  The VE then testified that if a person were absent from or late to work two or three times a week, the person would not be able to maintain competitive employment. (Tr. 76-77).

Upon questioning by Plaintiff's attorney, the VE testified that if the person described in the ALJ's first hypothetical were "limited to only occasionally handling and fingering as well as occasional bending and reaching," the jobs the VE had identified would be precluded.  (Tr. 77). He also testified that if the person in the ALJ's second hypothetical were limited to only occasional handling and reaching, those jobs would also be precluded.  (Tr. 77-78).  Plaintiff's attorney then described a third hypothetical individual:

> [I]f you could assume the following mental limitations, that socially he would be severely impaired – and that would be defined as marked, okay . . . I'm going to describe how she describes severity, okay?  She says resulting primarily in panic attacks, agoraphobia, with poor tolerance around people, as well as psychotic symptoms, primarily referential thinking, that the belief that everybody is talking about him, leading to a considerable amount of anxiety and to further avoidance and isolation; also very dependent on his mother in terms of going outside of the house.  In terms of ability to complete tasks, he would also be severely impaired, primarily due to difficulties in concentration and maintaining a task.  This is further aggravated by the anxiety.  If you just assumed those two impairments, would that affect most competitive jobs?

(Tr. 78).  The VE testified that it would affect most competitive jobs.  (Tr. 78).

## II.   PROCEDURAL HISTORY

Plaintiff filed his application for benefits under Title XVI of the Act on October 22, 2009, alleging disability because of dystonia,[19] bipolar, depression, nerve damage in the legs, and

---

[19] Dystonia is "a syndrome of abnormal muscle contraction that produces repetitive involuntary twisting movements and abnormal posturing of the neck, trunk, face and extremities." STEDMAN'S MEDICAL DICTIONARY 602 (28th ed. 2006).

short-term memory loss, with an alleged onset date of October 26, 2001.[20]  (Tr. 225).  Plaintiff's

application was denied initially on March 3, 2010.  (Tr. 90-94).  Plaintiff requested a hearing

before an Administrative Law Judge ("ALJ") on April 5, 2010, and a hearing was held before an

ALJ on January 19, 2011.  (Tr. 41-80, 97).  On March 2, 2011, the ALJ found that Plaintiff was

not under a "disability" as defined in the Act.  (Tr. 17-33).  The Appeals Council denied

Plaintiff's request for review on October 18, 2011.  (Tr. 5-7).  Thus, the decision of the ALJ

stands as the final decision of the Commissioner.

### III.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see

also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment must be "of such

severity that [the claimant] is not only unable to do his previous work but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy, regardless of whether such work exists in the immediate area in

which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if

he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

---

[20] There appears to be some confusion regarding Plaintiff's alleged onset date.  In his brief,
Plaintiff describes the alleged onset date as October 26, 2001, and that is the date the ALJ used.
Defendant asserts that the alleged onset date was June 6, 2008.  In Plaintiff's Disability Report –
Adult form dated November 7, 2009, he listed on onset date of October 26, 2001.  However, at
the hearing, Plaintiff's attorney indicated that Plaintiff would amend the date to July 1, 2008.
(Tr. 44-45).  The court's conclusion would be the same whether Plaintiff's alleged onset date
were October 26, 2001, June 6, 2008, or July 1, 2008.

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to

23

other work, the claimant will be found disabled.  20 C.F.R. § 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    DECISION OF THE ALJ

Applying the foregoing five step analysis, the ALJ here found that Plaintiff had never engaged in substantial gainful activity.  The ALJ found that Plaintiff had the following severe impairments: audioprocessing disorder, depression, anxiety, dystonia, action tremor, and bipolar disorder.  (Tr. 19).  She found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 25).  The ALJ found that Plaintiff had the RFC to perform light work except he could walk two hours, sit eight hours, and push/pull two hours in an eight-hour work day.  She further found that he could perform simple repetitive tasks with limited/occasional interaction with coworkers and supervisors, and little to no contact with the public.  (Tr. 26).

The ALJ found that Plaintiff had no past relevant work.  She found that Plaintiff was 23 years old, a younger individual, on the date the application was filed; that Plaintiff had a limited education; and that Plaintiff could communicate in English.  (Tr. 32).  Relying on the testimony of the VE, she concluded that considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 32-33).  The ALJ concluded that Plaintiff had not

been under a disability, as defined in the Social Security Act, from October 22, 2009 through the date of her decision.  (Tr. 33).

In appealing the ALJ's decision, Plaintiff contends the ALJ's decision should be reversed because (A) the ALJ's analysis of the credibility of Plaintiff's complaints was inadequate; (B) the ALJ erred in her evaluation of the opinions of consultative examiner, Dr. Soto; and (C) the Commissioner erred in failing to sufficiently consider new evidence presented to the Appeals Council.

## V.    DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).  In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision.  *Id.*  However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"  *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  "If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court

must affirm the ALJ's decision.'"  *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B.   THE ALJ'S ASSESSMENT OF PLAINTIFF'S CREDIBILITY

Prior to Step Four of the disability analysis, the ALJ is required to determine Plaintiff's residual functional capacity (RFC).  The RFC is defined as what the Plaintiff can do, despite his limitations, and it includes an assessment of physical abilities and mental impairments.  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).  As part of the RFC determination, the ALJ must evaluate Plaintiff's credibility as required under *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  More specifically, the ALJ must consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

The ALJ is not required to discuss each of the *Polaski* factors in relation to Plaintiff, and he is entitled to discount Plaintiff's complaints if they are inconsistent with the evidence as a whole.  *See Ford v. Astrue,* 518 F.3d 979, 982 (8th Cir. 2008).  The court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'"  *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)).

Here, the ALJ determined that Plaintiff had the RFC to perform light work, except that he could walk two hours, sit eight hours, and push/pull two hours in an eight-hour work day.  She further found that he could perform simple repetitive tasks with limited/occasional interaction with coworkers and supervisors, and little to no contact with the public.  (Tr. 26).  In assessing the severity of Plaintiff's symptoms, the ALJ generally found that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 29).  The ALJ cited to "a number of inconsistencies in the record, which do not enhance the claimant's credibility."  (Tr. 30-31).  However, the ALJ's credibility analysis falls short for at least two reasons.  First, many of the asserted inconsistencies either do not appear to be inconsistencies and/or are not supported by the record.  Second, the ALJ failed to adequately consider the required credibility factors in assessing Plaintiff's credibility and, in contravention of SSR 96-7p, failed to provide specific reasons for her credibility findings supported by evidence in the case record.

### 1.  Inconsistencies Cited By The ALJ

The bulk of the ALJ's credibility analysis consists of a long list of "inconsistencies in the record."  (Tr. 30-31).  However, many of the "inconsistencies" identified by the ALJ either do not appear to be supported by the record or are not actually inconsistencies.

For example, the ALJ pointed out, "During one evaluation in 2007, the claimant was quite animated talking about his son.  In 2010, the only time his affect brightened was when he was discussing how interesting sea monkeys were to have as pets."  (Tr. 31).  The court does not see any inconsistency in these statements.

The ALJ also pointed out supposed inconsistencies in Plaintiff's statements about his drug use, noting that Plaintiff stated in 2007 that he had used several drugs between ages 17 and

19; that in 2008 he admitted to marijuana and alcohol use twice in the past week; that a drug screen was negative; that he claimed that his drinking problem had been resolved; and that he used to smoke marijuana because it relaxed him.  The Court does not find these statements inconsistent.

The ALJ also noted that Plaintiff had denied any history of hallucinations or delusion in a February 2010 consultative examination with Dr. Long, even though he had been hospitalized in 2008 due to hearing voices.  (Tr. 31, 363).  The fact that Plaintiff denied a history of hallucinations during one consultative examination, when the medical evidence showed that he had been hospitalized for hearing voices on one prior occasion, does not appear to undermine the general credibility of his testimony.

The ALJ also noted that Plaintiff had told a psychologist that a neurologist told him that his dystonia caused bipolar disorder, whereas the psychologist had stated that dystonia was a neuromuscular disorder and did not involve cognitive or affective issues.  (Tr. 31).  This does not appear to be an inconsistency that casts doubt on the credibility of Plaintiff's subjective complaints, but rather evidence that Plaintiff may not fully understand the medical basis for his impairments.

The ALJ also noted that Plaintiff reported that antipsychotic medication seemed to aggravate a neurological deficit, resulting in dystonia.  (Tr. 31).  Again, whether or not this statement is medically accurate, the Court fails to see an inconsistency that undermines his credibility.

The Court notes that the ALJ did identify some inconsistencies that appear to undermine the Plaintiff's credibility to some degree, such as the fact that although Plaintiff reported to Dr. Soto that he had difficulty paying bills because he needs to go over and over things (Tr. 598),

Plaintiff and his wife reported in disability paperwork that he was able to pay bills.  (Tr. 236-37, 245-46).   However, when the record is viewed in its entirety, it is evident that the bulk of supposed inconsistencies identified by the ALJ were either not inconsistencies or were not supported by the record.  *See Ford*, 518 F.3d at 982-83 (remanding where some of the statements the ALJ relied on to show that Plaintiff's statements were inconsistent did not actually contradict each other or her subjective complaints); *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003) (remanding where the supposed inconsistencies identified by the ALJ were either not supported by the record or were not actually inconsistencies).

### 2.  *Credibility Factors and SSR 96-7p*

In assessing Plaintiff's credibility, the ALJ cited some facts that are relevant to credibility factors one, four, five, and seven; however, the cited facts are either not inconsistent with Plaintiff's subjective complaints or do not support of the ALJ's credibility determination when they are viewed in the context of the record as a whole.  For example, the ALJ noted that Plaintiff helped with household chores and took care of his daughter when he "felt good," indicating that she considered some facts relevant to the first factor (daily activities).  (Tr. 30).  However, the Eighth Circuit has "repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."  *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotation marks omitted). In addition, although Plaintiff helped with chores and took care of his daughter when he "felt good," he also testified that two or three days a week, he was too exhausted to do anything.  (Tr. 58).  After reviewing the record, the Court finds no inconsistencies between Plaintiff's description of his daily activities and his subjective

complaints of difficulty being around people other than family, paranoia, difficulty concentrating, pain, shakiness, or other symptoms.

The ALJ also noted that Plaintiff's symptoms "were generally better with medication compliance," which is relevant to the fourth factor (the dosage, effectiveness, and side effects of medication). However, it does not appear that she considered the fact that Plaintiff reported significant side effects from his medications to his physicians. The ALJ also failed to address substantial evidence in the record reflecting the fact that Plaintiff's psychiatrist was continuously trying and discontinuing different medications in 2010 and 2011 in an attempt to find a combination of medications that would be effective in treating Plaintiff's hallucinations and other mental symptoms. (Tr. 561, 589, 592-93, 636, 639, 641-42).

The ALJ further noted that Plaintiff's own treating physician (Dr. Haas) "stated that he could perform work at the light exertional level," which is relevant to the fifth factor (functional restrictions placed on Plaintiff by his physicians). However, the ALJ ignored the statement in Dr. Haas' Medical Source Statement that Plaintiff could only occasionally handle, finger, bend, and reach. (Tr. 567). Significantly, the VE testified that an individual who could only occasionally handle, finger, bend, and reach could not do the jobs identified by the ALJ, such as small products assembling and hand packaging. (Tr. 32-33, 77). [21]

---

[21]Plaintiff does not challenge ALJ's consideration of Dr. Haas's opinion. However, the court notes that the ALJ's failure to explain the weight he gave to Dr. Haas's opinion or the reasons for the weight given, despite the fact that Dr. Haas was Plaintiff's treating physician, is in itself a basis for remand. *See Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (quoting 20 C.F.R. § 404.1527(d)(2)); *Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand").

With respect to the seventh factor, the ALJ does discuss some of the objective medical evidence related to Plaintiff's claims, but she fails to explain how, if at all, the medical evidence undermines the existence of his specific subjective complaints.  In addition, her discussion of the medical evidence related to Plaintiff's mental impairments includes no discussion of the mental status examinations or diagnoses of either Plaintiff's treating psychiatrist or examining psychiatrist Dr. Soto, which included numerous notes supporting Plaintiff's subjective complaints, including observations of blunted or anxious affect and slow production of speech, as well as notations that Plaintiff had paranoid or persecutory thought processes, had auditory hallucinations, and was responding to internal stimuli.  (Tr. 29-30).

The ALJ's credibility analysis contains little or no analysis of the second factor  (the duration, intensity, and frequency of Plaintiff's symptoms) or the third factor (precipitating and aggravating events), despite evidence in the record concerning Plaintiff's alleged anxiety, auditory or visual hallucinations, paranoia, difficulty concentrating, memory loss, pain, shaking, and inability to sit or walk up stairs.

With respect to the sixth factor, the ALJ cited some facts suggesting that Plaintiff stopped working in part for reasons other than his disability.  (Tr. 30, 225).  However, those facts alone, affecting one credibility factor, do not constitute substantial evidence that supports the ALJ's credibility assessment.

Finally, although the ALJ recites a number of facts from the record, her decision does not explain the reasons for her credibility determination, nor does her decision make clear to this Court the weight she gave to Plaintiff's statements or the reasons for that weight.   Security Ruling 96–7p provides:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Social Security Rulings are treated with deference by the court; where a reasonable interpretation of the statute is offered, it is lawful.  *Barnhart v. Walton*, 535 U.S. 212, 224, 122 S. Ct. 1265, 152 L.Ed.2d 330 (2002).

In sum, this matter must be reversed and remanded because, as the record currently stands, it does not appear that the ALJ adequately considered all of the required factors in her credibility assessment or that she complied with the requirements of SSR 96-7p.  On remand, the ALJ should consider all of the required factors in determining Plaintiff's credibility, and she should make clear which of Plaintiff's complaints she finds credible, and which she does not find credible.

### D.  THE ALJ'S CONSIDERATION OF DR. SOTO'S OPINION

Plaintiff also argues that the ALJ failed to adequately address the opinion of Dr. Soto in determining Plaintiff's RFC.

At the outset, the Court notes that because Dr. Soto did not treat Plaintiff, but only performed a consultative examination, her opinion is not entitled to controlling weight.  *See Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) ("A single evaluation by a nontreating psychologist is generally not entitled to controlling weight.").  Nevertheless, the ALJ is required to consider every medical opinion he or she receives.  *See* 20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  Where an opinion is not given controlling weight as the opinion of a treating source, the weight given to the opinion depends on a number of factors, including whether the source has examined the claimant,

whether and how the source has treated the claimant, the relevant evidence provided in support of the opinion, the consistency of the opinion with the record as a whole, whether the opinion is related to the source's area of specialty, and other factors.  20 C.F.R.  § 416.927(c).

"'[I]t is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).   Similarly, when multiple consulting physician opinions exist, it is "the ALJ's task to resolve the differences . . .  in the light of the objective evidence." *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010).

The ALJ's discussion of Dr. Soto's opinion indicates that the ALJ discounted Dr. Soto's opinion in large part because it depended on Plaintiff's subjective complaints: the ALJ emphasized that Dr. Soto had accepted the statements of Plaintiff and his mother without question[22] and that Plaintiff had presented to Dr. Soto complaints that were not frequently present elsewhere in the record.  (Tr. 31).  Thus, after the ALJ re-assesses the credibility of Plaintiff's complaints, her evaluation of the appropriate weight to give to Dr. Soto's opinion may change.  On remand, the ALJ should evaluate Dr. Soto's opinion in light of the factors described in 20 C.F.R. § 416.927(c), including the medical evidence Dr. Soto cites in support of her opinion and the consistency of Dr. Soto's opinion with Plaintiff's subjective complaints and the record as a whole.

The Court further notes that it is difficult to determine the weight the ALJ gave to the opinion evidence of physicians other than Dr. Soto.  As noted above, the ALJ failed to explain the weight she gave to the Medical Source Statement of Plaintiff's treating physician, Dr. Haas,

---

[22] The court notes that it does not appear that Dr. Soto's report was based solely on the statements of Plaintiff and his mother; she also conducted a mental status examination involving her own observations of Plaintiff as well as some objective tests of Plaintiff's cognitive functioning.  (Tr. 665).

or the reasons for the weight (or lack of weight) she gave to that opinion.  *See Tilley v. Astrue*, 580 F.3d 675, 679-80 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (quoting 20 C.F.R. § 404.1527(d)(2)).  That failure is significant, because had Dr. Haas's opinion that Plaintiff could only occasionally handle and finger been given controlling weight, the jobs the VE and the ALJ identified as available to Plaintiff would no longer be available.  (Tr. 77, 567).

In addition, although the ALJ stated that she "accepts the statements and conclusions of the state agency psychologist," she did not explain why she accepted those statements and conclusions over those of Dr. Soto or others.  (Tr. 31).  It is also somewhat unclear what psychologist she was referring to.  She may have been referring to Dr. Joseph Long, a psychologist who examined Plaintiff, or she may have been referring to the opinion of Stanley Hutson, Ph.D., who apparently did not examine Plaintiff.

On remand, in addition to re-evaluating Dr. Soto's opinion, the ALJ should make it clear that she has properly evaluated all of the opinion evidence in the record in accordance with the requirements outlined in 20 C.F.R. § 416.927.  She should also make it clear which opinions she is relying on in assessing Plaintiff's RFC.

### E.  ADDITIONAL EVIDENCE BEFORE THE APPEALS COUNCIL

Plaintiff also argues that the Appeals Council erred by failing to consider new and additional material submitted to it.  Pl.'s Br. at 19-20.  The additional evidence consisted of treatment notes from Crider Health Center from February through April of 2011, as well as a Psychiatric Evaluation Note written by Dr. Ana Maria Soto, M.D.  (Tr. 670-81).  Because the Court finds remand is required for other reasons, the Court need not reach this issue.  On remand,

the ALJ should consider all of the available evidence, including that submitted to the Appeals Council.

## VI.   <u>CONCLUSION</u>

For all of the foregoing reasons, the court finds the ALJ's decision is not supported by substantial evidence.  Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and this matter is **REMANDED** for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).


<u>/s/Shirley Padmore Mensah</u>
 SHIRLEY PADMORE MENSAH
 UNITED STATES MAGISTRATE JUDGE


Dated this <u>29th</u> day of <u>March</u>, 2013.